The first case on the docket this morning is case number 1895-79, Matumona v. Barr. Counsel, we're ready to hear from you. May it please the Court, my name is Tassidy Johnson and I represent the petitioner, Adama Matumona. I'd like to begin with the firm resettlement issue which barred Mr. Matumona from asylum. If the Court agrees with us on that issue, a remand is necessary because the IJ and the BIA did not reach the merits of Mr. Matumona's asylum claim. Then I'd like to discuss Mr. Matumona's case for withholding of removal. Would you speak a little slower? Oh yes, absolutely, sorry. A little more slowly, a little more... Yeah, would you repeat what you just said? Now that we can hear you. Okay. I always tell young lawyers, if we can't hear you, we can't help you. So it's always a good idea to make sure that you're being heard as you start. Okay, and just let me know if I'm going too fast. All right, thank you. It's nice to be soft spoken, but do it next to the microphone. So the ultimate question of firm resettlement here is, did Angola make an offer of official immigration status to Mr. Matumona? And the answer here is no for three reasons. That's a question of fact or law? Your Honor, that's a question of, well, it's a mixed question, I believe. It's a question that the BIA was able to reach as a matter of law. Was this passport that was issued an official passport or was it a phony one? So there's no evidence in the record, Your Honor, that the passport was issued through any official channels or that the passport was issued from the Angolan government. The only evidence in the record that we have is that Mr. Matumona testified that he bribed an Angolan official to make a passport for him in a false name so that he can escape Angola. That's the only testimony here on the procurement of the passport. Okay. And that's one of the reasons why Angola did not make an offer to Mr. Matumona. The other reason is that, as I alluded to, no offer was actually made to Mr. Matumona at all. So the passport is the government's only evidence of firm resettlement here, and that passport wasn't issued in Mr. Matumona's name. It was issued in a false name. Isn't the evidence of driving the taxi and relocating his family relevant to this issue as well? Those issues are, they would, one, be relevant, I believe, under the third step of the BIA's analysis in firm resettlement, which requires an assessment of the totality of circumstances, and they could also go to the question of whether the firm resettlement exception applies here. But they don't go to the initial question in which the government bears the burden, which is whether the government has made a prima facie case of firm resettlement. How would you compare this to a matter of, I want to make sure I get this right, a matter of DX and YZ? So a matter of DX and YZ, which is the government's main authority for its position here, doesn't apply here for two reasons. The first is that the non-citizens in that case Well, why don't you tell us what it holds first and then talk about it. Oh, yes. So what that case held was that under the particular facts of that case, the non-citizens' use of a fraudulent passport Of a what? Of a fraudulent passport. Thank you. Just stay close and understand. Oh, yes, stay close. We're having a hard time understanding it. So what that case held was that the applicants there were firmly resettled in a third country even though they argued that the passport they used was fraudulent. And the reason that the court held that there and the reason that the holding doesn't apply here was twofold. So first, the non-citizens there apparently had residence permits, it's actually the legal document they had, in their own names. And we know that because one of the petitioners was able to use her original passport, the passport from her country of origin, as well as the permit to travel. In addition, the evidence there was that the non-citizens were able to re-enter the third country using the permit that they claimed was fraudulent, which allowed the inference there that the government of the third country recognized the document as valid despite their having been procured through fraud. How long did your client remain in Angola after the passport was issued? The client, Mr. McNamara remained in Angola, I believe, for around five months after the passport was issued because he needed to get money in order to be able to leave Angola. So that was his reason for being in Angola for that period. And it wasn't 18 months overall? I believe it was roughly over a year. I don't believe that it was 18 months. I can check the record and confirm that on rebuttal. After his return, you're adding the additional months or when? I'm sorry? You had five months after the passport was issued, but you said 18 months to Judge Matheson. Were the other months, the other years, were part of the time period during which he held the passport or was it after that? So I believe that Mr. McNamara was in Angola for over a year. I don't believe it was 18 months, so I'll clarify the exact number of months. Prior to the passport? No, so Mr. McNamara was... Then is your answer to my previous question wrong then? I think my question was, I hope it was precise enough, how long did your client remain in Angola after the passport was issued? After the passport was issued, he remained in Angola, I believe, for around five months in order to get money to leave. But Mr. McNamara was never in Angola for, Mr. McNamara was in Angola for over a year. Before, a lot of that time was before he got the passport. Yes, Your Honor. So Mr. McNamara got the passport after arriving to Angola. Now, this firm resettlement issue, you have to prevail on that issue. Is that correct? Or do you have any issues that would entitle you to relief if we determine that the decision that he was firmly resettled should be upheld? Well, Your Honor, we believe that Mr. McNamara clearly was not firmly resettled, based on the evidence I stated previously. But even if you disagreed with us on that, Mr. McNamara would still qualify for the firm resettlement exception, or at the very least, the BIA's finding of firm resettlement was wrong. The standard under the firm resettlement... Well, just to be clear, I want to make sure that the answer to Judge Hart's question is complete. If we disagree with you on firm resettlement, is your argument about withholding of removal still a viable argument? That is also a viable argument as well. So I'll just state to be clear. So the answer is yes, that plus, or is there something else? What do you mean by as well? So, Your Honor, Mr. McNamara would still qualify for the firm resettlement exception, even if you disagreed with us that he was firmly resettled in Angola. He would also qualify for withholding of removal relief. So the firm resettlement exception and the firm resettlement issue more broadly go to Mr. Matamona's claim for asylum. Okay. Yes. Thank you. So... By the way, can I just ask, has Mr. Matamona been removed? So, Your Honor, to our knowledge, Mr. Matamona has not been removed yet. The government attempted to remove him, but was unable to effectuate the removal. You mean they couldn't find him? They found him, but our understanding was that they were not able to remove him. He's in detention, so... So, again, as I stated previously, even if you disagree with us on the... even if you find that Mr. Matamona was firmly resettled in Angola, Mr. Matamona would still be qualified for asylum here, because the BIA's finding that the firm resettlement exception doesn't apply here was wrong. So the standard on that exception has three elements. So the first is, was the person in the third country as a necessary consequence of their flight? Were they in the third country only as long as needed to leave? And did they not establish any significant ties in that third country? Mr. Matamona made a showing on the first two elements. It's undisputed that Mr. Matamona went to Angola to escape being sought after by DRC government security officers. And Mr. Matamona testified that he left Angola as soon as he had the money and documents to be able to leave, and that he had no intent to stay in Angola, because Angola is an ally of the DRC government, and because he knew that Angola was itself hostile to political activists like himself. The BIA's decision focused on whether Mr. Matamona had established significant ties. But two of the grounds that the BIA relied on in order to find significant ties were actually unsupported by the record. So the BIA found that Mr. Matamona had been adopted by an Angolan family. But Mr. Matamona had testified that the adoption was not legal. Is there any authority out there for the proposition that there cannot be permanent settlement if it is based on a knowingly fraudulent document? Your Honor, what the PIA has said, and what it said in matter of DX and YZ, is that the fact of the fraudulent nature of the documents is not an issue at all for an applicant's qualification for asylum. So the fact that the documents are fraudulent themselves isn't a bar to asylum relief. Under agency law? Under agency law, but the court also- Is there any circuit authority or other authority out there, Supreme Court authority? Well, the PIA relies on its own law as well as two Ninth Circuit decisions for that proposition. What are those decisions, and what do they hold? I can pull. I have the two sites here. I don't have the actual decisions themselves. I'm happy to submit additional authority on these two cases. In general, what do they stand for? In general, what they stand for, and I can read the language from matter of DX and YZ, is that it's well settled that an alien is not faulted for using fraudulent documents to escape persecution. It is well settled what? Would you slow down just a touch and try to articulate a little more carefully? Sure. Thank you. I'm trying desperately to understand you. It is well settled that an alien is not faulted for using fraudulent documents to escape persecution and seek asylum in the United States. And the PIA there relies on its own law as well as the decision Singh v. Holder from the Ninth Circuit, a 2011 case, Angola v. Gonzalez, a Ninth Circuit case from 2007. Thank you. So just stepping back to the firm resettlement exception and the PIA's improper analysis of that exception. So the PIA also found that Mr. Amantapona had citizenship in Angola, but as I previously argued, that citizenship consisted of nothing more than an Angolan passport and a false name, and there was no evidence that that passport was issued through any official channels. So why do you use the word citizenship? There the PIA used the word citizenship. The PIA assumed citizenship. You've taken your disagreement with that. Yes, Your Honor. All right. I'd like to reserve the remaining time. Yes, reserve. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Remy Darocha Afodu, representing the U.S. Attorney General. There are three major issues in this case, firm resettlement, alleged due process violations, and the merits of Petitioner's claim for withholding of removal. With the Court's permission, I'd like to address the three issues in that order. If you speak too closely, it'll pop. If you do it just right, the sweet spot, it'll be perfect. Thank you. So I'd like to address the three issues in that order. First, with the issue of firm resettlement. Petitioner's ability to secure Angolan citizenship and— had been fraudulently issued or was alleged to have been fraudulently issued. I'm sorry, Your Honor. I didn't hear your question. At the time that the hearing officer entered his order, did he have evidence and was he aware that the passport at issue was fraudulently issued or claimed to have been fraudulently issued? Mr. Matamona did state that the passport was fraudulently issued, Your Honor. And did the hearing officer enter a finding on that point? Well, the hearing officer did not specifically state that the passport was fraudulently issued. What was his finding? Because the passport was not in the record, Your Honor. Beg your pardon? The passport, a copy of the passport was not in the record because Mr. Matamona had lost it in transit. All right. But based on his testimony that he was able to use that passport to get a visa to Brazil and that he also was able to renew his visa in Brazil, goes to the point that this was officially valid document that he was able to use to travel. And Mr. Matamona himself did state that he was able to use that passport without inhibition to travel. And so his ability to secure that passport, citizenship in Angola and that Angolan passport, coupled with his stay in Angola for almost two years, constitute prima facie evidence. After the passport was issued? I'm sorry, Your Honor. Not two years after the passport was issued? No. We're told five months. No. What I'm saying is that he stayed in Angola. His total stay in Angola. I understand that. Yes, Your Honor. So your answer is no, not two years after the passport was issued, but rather how many months after it was issued? Yes, Your Honor. How many months? In the record, it appears to be about five or six months he stayed in Angola. So are you saying that somebody who sneaks into a country and remains there for 15 months is permanently resettled? Well, the totality of the circumstances have to be. You don't hold that true for American people who come into the United States? You don't consider them here permanently resettled if they have been here for 15 months without any juror or de facto authority? Yes, Your Honor, but because Mr. Matamona was able to live there and secure that passport and secure citizenship, that is an extremely important and pertinent fact. Does it matter if it was lawfully obtained, the passport, or if it was fraudulently obtained? According to the board's decision and three circuit courts, it really does not matter. So long as it is officially. And what are those circuit authorities that say that the reliance on a fraudulent passport can be utilized for purposes of determining permanent resettlement? Yes. May I modify that question? The passport could be fraudulent in different ways. It's not that the passport is not an official document. It's that the issue here is whether it was fraudulently obtained. In fact, Your Honor, in Shavey Holder, that's a Ninth Circuit case, it specifically states that absent some government disposition, an alien who unlawfully enters a nation cannot obtain official resident status. But here there has been some government dispensation, even if the document was fraudulently obtained. So long as it is officially valid, and in this case it was officially valid because he was able to get a Brazilian visa, and he was also able to renew that Brazilian visa in Brazil where he stayed for a while. So the counsel, just to be clear, the passport didn't have Mr. Matamana's name on it, correct? The true name isn't on the passport. The true name is not on it, but that doesn't really matter because he assumed an alias. He did say... I understand. My question, though, is, is it a factor that his name wasn't on it, or does it truly just not matter? It's not relevant. It is not entirely relevant, Your Honor. Well, you said entirely. Is it relevant or is it not relevant? Well, it is not relevant, Your Honor, because he was able to use that passport, and it enabled him, and he also gained citizenship. Isn't the test, though, that the country is making an offer of permanent residence, and how could Angola be making an offer of permanent residence to Mr. Matamana when the name on the passport is not his name? Well, it was a name that he adopted and that he used, and that his entire family. He claimed that he brought all nine, eight children, and he bore another child there, and his wife. And he used that name. Was his picture on it? Apparently his picture was on it because it was officially valid. He had to go to the Brazilian embassy to get a visa. If his picture were not on that passport, there would be no way for him to get the visa. You mentioned having his family there, and then he was driving a taxi, and he was there for a certain period of time. It seemed as if Ms. Johnson's argument was that that doesn't go to the offer or the firm resettlement. It goes more to the exception. Would you agree with that? No, Your Honor, because this court has adopted a broader conception of firm resettlement by applying the totality of the circumstances, of the alien circumstances, and that is what Abdallah mentioned about family ties. And so there were so many factors that the agency looked at to come to this conclusion that he was firmly resettled in Angola. And that passport was prima facie evidence, and the government, you know, did have that evidence of firm resettlement in this case, Your Honor. That passport, according to the board's decision and the three circuit court decisions, they were always stated that even if you have a fraudulently obtained document, so long as it has the indicia of reliability, which we know that it did in this case, because he was able to obtain a visa to Brazil and renew that visa in Brazil, it was officially valid document. Is there any evidence in the record that the passport has been recognized by the Angolan government? There is no record in the evidence, Your Honor, that it was not recognized by the Angolan government because he was able to use that passport to leave the country, and nobody questioned it at the airport when he left. And the fact, again, that he was able to use that passport to get a visa speaks volumes, that it was officially valid. And that is the most important issue, Your Honor. Now, even if he was firmly established, you agree that he could still obtain withholding of removal. Is that correct? Well, going to the withholding of removal, no. No, no, just answer the question. You agree that he's still eligible for it? Oh, yes, he is. That, yeah, that does negate that, you know. There is also the exception to firm resettlement issue in this case, which Mr. Matsumoto certainly does not qualify for because he had significant ties in Angola, which is one of the tests. He lived there for almost two years. He was able to bring his entire family, eight children and his wife, and he had a ninth child in Angola. Moreover, he did not testify that he remained in Angola only as long as it took him to arrange onward travel. He stated that he was safe in Angola. The issue of being afraid of going back to Angola came up when he was asked why he could not go back to Angola. In his testimony before the court, he said he was not harmed in Angola. He lived there safely. He had no problems there. In fact, he testified that he left Angola because things did not work out. In effect, what you are promoting on behalf of the United States government is a policy that encourages fraud against third countries. Oh, no, Your Honor. Now, this gentleman is not a citizen of Angola, correct? Well, he did state that he was a citizen of Angola on the record. Well, he may have lied about it. Who knows what else he may have lied about? But is there any evidence that he is a citizen of Angola? His own testimony, Your Honor. Testimony in these proceedings. In the proceedings. And he was found credible. I beg your pardon? He was found credible, Your Honor. He stated that he was a citizen of Angola. But my question is, has Angola ever recognized his citizenship as a citizen of Angola? And again, Your Honor, the fact that he was able to leave that country with officially valid Angolan passport. It seems to me the fact that he's able to leave is hardly any evidence that he's a citizen of that country. Well, the fact that he was able to pass through the airport to immigration officials with a facially valid document is evidence. And nobody has retrieved that. With a facially valid document is proof that the guy left the country under fraudulent circumstances. That's about all it proves in my mind. I mean, if Judge Hartz goes to Canada and Breitel goes over and gets a fraudulent passport, that doesn't mean he is permanently resettled in Canada. No, it does not necessarily mean that he's settled in that country. And if he uses the passport to come back to the United States, it seems to me that would be high evidence that he had no intent to permanently resettle in Canada. Yes, but the courts that have handled this issue, Your Honor, have stated very clearly that the fact that there has been some government dispensation, and this passport was shown to be facially valid, is very, very crucial to this case, Your Honor. May I ask a question about withholding of removal? Yes, Your Honor. You say that the petitioner did not preserve in the BIA a pattern or practice claim. Yes, Your Honor. But he sure seems to be raising it in some of those documents. And I wasn't clear why you thought it was insufficient. Well, he did not explicitly state that he was raising a pattern or practice, a violation of his rights in the DRC. Let me just read one passage and see why this isn't raising it. He says, based on the past threats and psychological abuse he has suffered, along with the current country conditions evidence that the government continues to target opposition activists with impunity, clearly establishes that he has a well-founded fear of persecution. Isn't he saying that because of the government's pattern and practice of retaliating against opponents, that he has a legitimate fear that if he returns there, he'll be persecuted? Okay, Your Honor, even if he did, Your Honor, the fact that he's made such a claim doesn't mean that an individual-analyzed analysis of his claim cannot be made. He still has to show that he himself is personally at risk. The showing that country conditions do not favor him based on his activities as a dissident is not enough to grant him withholding of removal. Is it enough to raise a pattern and practice claim? Pardon me, Your Honor? Is it enough? Is that what I read there? Isn't that enough to at least make the pattern and practice claim? Well, it could be, Your Honor, but even if he did, Your Honor, he still has to show an individualized claim. Okay, but did the BIA respond? Did it address a pattern and practice issue in its decision? Because the question I have is, it seems to me he raised it. It's not clear that the BIA responded. We can't affirm. Go ahead. The board is not required to address every little bit, every particular issue that is raised. So long as it has addressed the issue in a way that is clearly understood and the fact that there are other dispositive, independently dispositive issues in this case that render his claim of withholding of removal meritless, the board is not necessarily inclined to address that. But the board did talk about the country conditions. But he submitted the State Department report, country conditions evidence. And if I'm understanding your argument, you're saying if that's relevant, it's not enough. But if the board, if he's presented it and argued it and the board hasn't said anything about it, how can we be confident the board even considered it? The board did talk about country conditions and said being looked for is not enough to satisfy a claim for withholding of removal, Your Honor. Being looked for plus having several of his fellow dissidents having been slaughtered, that's not enough? Well, Your Honor, he was able to go underground. He hid and he emerged. So as long as he can hide, that's okay. Well, in the past, he's been able to do that and he was safe. And that is one of the best indicators of what will happen in the future, Your Honor. The fact that when he emerged from hiding, he was safe. Nothing happened to him. That is one of the best indicators of what will happen in the future, the fact that. So if I'm understanding you. Yes, Your Honor. You're saying that even if he shows that in the country dissidents are pursued, he's not entitled to relief on that basis because he couldn't show that the government had any interest in him. Is that what you're saying? Well, he was not able to show that the government specifically went after him. And he was able to go into hiding and emerge from hiding without harm. But we're talking about for the future. Yes, for the future, Your Honor. He has not been able to show that anyone has any interest in him, Your Honor. Okay. That's what I was asking. Yeah. He hasn't been able. And it's been several years. And again, Your Honor, may I quickly add, if you would like to take judicial notice. You're one and a half minutes over. Yeah, judicial notice of the fact that the government in the Congo has changed. And a favorable government is in power now, as of January 25, 2019. Thank you very much. Thank you very much, Your Honor. Would you add a minute and 43 seconds to the other side's argument, please? We're ready to hear you. I just have four points on rebuttal. So the first is that the BIA's own firm resettlement regulation and its interpretation of that regulation and matter of AGG clearly state that an offer is required, mere period of residence, and that their country is not enough. And accordingly, the BIA's decision relied solely on the passport and Mr. Matamona's testimony about it to find that the government had satisfied its burden to show a prima facie case of an offer. Secondly, Brazil's treatment of Mr. Matamona's, of the Angolan passport, there's no indicia of whether Angola considered the passport official. Again, there's no evidence in the record of how Angola, or there's no evidence in the record that Angola considered the passport official, that the passport was issued through any official channels. How would that be shown? How do you show that the government treats it as official? Well, Your Honor, in matter of TXNYZ, the BIA was able to infer that the government considered the passport official because there the petitioners were able to reenter the country using it. Here he was able to leave the country. They were able to reenter the country, the third country. You're saying in that case he was able to reenter. Opposing counsel said that the fact that he was able to use that passport upon leaving the country shows that the government treated it as official. Yes, Your Honor. How do you respond to that? I'm sorry. Your Honor, there's no evidence that the Angolan government did anything with the passport or that the Angolan government considered or reviewed the passport at all in allowing, or when Mr. Matamona left. So the only evidence that we have on the record is that Mr. Matamona was able to get a visa to Brazil using the passport. Why isn't the issuing of the passport an indicator that the government thought it was official? Because they aren't in the business of issuing unofficial passports, are they? Well, Your Honor, there's no evidence that the Angolan government itself actually issued the passport. The only evidence that we have on the record on the provenance of the passport is Mr. Matamona's testimony that he bribed someone to make the passport in a false name. So there is no evidence that the passport was issued through any kind of official channels. Third, if there's any doubt on the Court's part regarding the provenance of the passport or the use of the passport because of the state of the record, remand is all the more appropriate. Who has the burden? I thought that the government's argument was you have an official document. Perhaps it was obtained improperly. But once you have that, there's a presumption in favor of the government allowing him to stay. And then it's the petitioner's burden to overcome that presumption. Do you agree with that? I agree, Your Honor, that that is the framework. But the government here hasn't established their or hasn't met their prima facie burden. So they haven't established enough to create the presumption in your view? Yes, Your Honor. But if we agree with the government that there was enough, then the absence of further evidence falls on your shoulders, does it not? Well, Your Honor. There are lots of questions here we'd like to have answered. But there's a question of who had the burden of producing that evidence. Your Honor, if you were to find that the government had made its prima facie case, Mr. Mantamona still submitted evidence that rebutted that case by showing that the passport, by showing, well, he testified in particular that he had no legal status in Angola, that he never legally changed his name to match the name on the passport, and that he retained his Congolese nationality throughout. Was that in the affidavit after the hearing or in his testimony at the hearing? It was in his testimony at the hearing as well as in the affidavit. Counsel, I'm interested in your response to the government's last point. Have there been developments in the Democratic Republic of Congo that could or should be considered in resolving this case, particularly the withholding issue? No, Your Honor. Those developments cannot and should not be considered in this case because they are not on the record here. The record is closed on the matter, and the record is what it is in part because of the repeated attempts or because of the government's repeated litigation of this case. This is the second time we've been on appeal here because previously the government voluntarily remanded. So it would not be proper for the government to use the delay of time that's been a direct result of that. So the way this works is that we have to freeze everything in time, even though there might be things happening that speak to fear of future persecution. Is that correct? Well, yes, Your Honor, because you're reviewing the BIA's decision. I understand. Yes, and the BIA, the government didn't argue that. If you have authority on that, would it be all right to submit a 28-J letter and the government may also? Oh, absolutely. About how we deal with something that we could take judicial notice of, but it's not in the record. Yes, certainly, Your Honor. Thank you. Okay. Having no further time, thank you. Thank you. Counselor excused. The case is submitted. We turn to the next case this morning.